# FRIER LEVITT

A T T O R N E Y S   A T   L A W

Jonathan E. Levitt, Esq. (JL 3881)
Todd Mizeski, Esq. (TM 3854)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com

Attorneys for Plaintiff, Bleeding Disorders Resource Network, LLC.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLEEDING DISORDERS RESOURCE NETWORK, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> CVS CAREMARK CORPORATION, CAREMARK RX, LLC, and CAREMARK, LLC, <br><br> Defendants. | Civil Action No. 2:12-cv-02987-SRC-MAS <br><br> Hon. Stanley R. Chesler, U.S.D.J. <br> Hon. Cathy L. Waldor, U.S.M.J. |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A STAY IN FAVOR OF ARBITRATION, OR TO DISMISS

## <u>TABLE OF CONTENTS</u>

PAGE

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT...........................................................................................1

STATEMENT OF FACTS ....................................................................................................2

LEGAL ARGUMENTS ........................................................................................................8

**POINT I**

DEFENDANTS' MOTION MUST BE DENIED AS A MATTER OF LAW BECAUSE BDRN DID NOT ENTER INTO AN AGREEMENT WITH DEFENDANTS TO ARBITRATE THE INSTANT DISPUTE AND THERE
IS NO APPLICABLE ARBITRATION AGREEMENT BETWEEN THE PARTIES.......8

    A.    There Is No Dispute That an Arbitration Agreement Exists
Between BDRN and Caremark, LLC, Albeit In a Contract
Governing an Entirely Unrelated Subject Matter................................................9

    B.    Assuming a That a Valid Arbitration Agreement Exists,
Plaintiff's Claims Are Outside the Scope of the Asserted
Arbitration Clause in the Retail Pharmacy Agreement Because
They Do Not Arise Out of Nor Are They Connected to the
Retail Pharmacy Agreement ...............................................................................9

    C.    BDRN's Claims Against Non-Signatories Cannot Be Subject
to Arbitration as the Non-Signatory Defendants May Not
Invoke Rights Under the Retail Agreement .......................................................20

        1.    The Non-Signatory Defendants Are Contractually Barred
From Asserting the Equitable Estoppel Doctrine ............................................20

        2.    Defendants Cannot Compel Plaintiff to Arbitrate Against
Non-Signatories Because Arizona State Law, Rather than
Federal Common Law Controls Whether Third Parties May
Enforce Arbitration Clauses..............................................................................21

        3.    Even If *Grigson* Were Applicable, Equitable Estoppel Does
Not Warrant Compelling Arbitration of Plaintiffs' Claims
Against the Non-Signatory Defendants..............................................................25

i

a.     None of BDRN's Against the Non-Signatory Defendants
Rely Upon or Derive From the Retail Agreement In Any Way .....................27

b.     This Court Has Discretion to Deny the
Non-Signatory Defendants' Motion to Compel Arbitration
Even Where One *Grigson* Factor Is Present........................................................28

**POINT II**

EVEN IF THIS COURT COMPELS ARBITRATION AGAINST DEFENDANTS ON THE CLAIMS FOR VIOLATIONS OF ANY WILLING PROVIDER LAW, PLAINTIFF MUST STILL BE PERMITTED TO LITIGATE CLAIMS AGAINST DEFENDANTS FOR TRADE SECRETS MISAPPROPRIATION AND INTERFERENCE WITH ECONOMIC RELATIONS........................................................29

CONCLUSION...............................................................................................................30

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Arthur Andersen LLP v. Carlisle, 129 S.Ct. 1896 (2009) ................................................... 22,23

AT & T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643 (1986) .............. 8,9,10

AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011).................................20

Brayman Construction Corp. v. Home Insurance Co., 319 F.3d 622 (3d Cir. 2003) .........................11

Charles Schwab & Co., Inc. v. Reaves, CV-09-2590, 2010 WL 447370 (D. Ariz. Feb. 4, 2010) .........27

Corvel Corp. v. Sw. Louisiana Hosp. Ass'n, CV-05-1330, 2007 WL 594904
  (W.D. La. Feb. 21, 2007) ............................................................................................... 17,18

Cost Bros. Inc. v. Travelers Indem. Co., 760 F.2d 58 (3d Cir. 1985) ...........................................9

Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co., 682 P.2d 388 (Ariz. 1984)...................23

Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985) .........................................................8

Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681 (1996) ........................................................23

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002) .............................................................21

Evancho v. Fisher, 423 F.3d 351 (3d Cir. 2005) ....................................................................9

FCI USA v. Tyco Electronics Corp., Civ. No. 2:06-CV-128-TJW, 2006 WL 2037557 (E.D. Tex. July
  18, 2006) .........................................................................................................................16

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) .............................................. 10,23

Fleetwood Enterprises, Inc. v. Gaskamp, 280 F.3d 1069 (5th Cir. 2002) ........................................26

Flying Diamond Airpark, LLC v. Meienberg, 156 P.3d 1149 (Ariz. App. 2007) ...............................23

Frindar Megasoft Int'l, Inc. v. Telcordia Techs., Inc., No. A-06-CA-600 LY, 2006 WL 3063434
  (W.D. Tex. Oct. 26, 2006) ....................................................................................................19

Granite Rock Co. v. Int'l Broth. of Teamsters, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010) ................10

Grigson v. Creative Artists Agency, LLC, 210 F.3d 524 (5th Cir. 200)......................................passim

Hill v. GE Power Systems, Inc., 282 F.3d 343 (5th Cir. 2002) ............................................... 26,29

Howsam v. Dean Witter Reynolds, 537 U.S. 79 (2002) ...........................................................8,9

Jansen v. Salomon Smith Barney, Inc., 776 A.2d 816 (N.J. Super. Ct. App. Div. 2001).....................19

John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964) .......................................................9

Kanoff v. Better Life Renting Corp., CV-03-2363, 2008 WL 442145 (D.N.J. Feb. 14, 2008)..............9

Klay v. All Defendants, 389 F.3d 1191 (11th Cir. 2004).............................................................27

Knight v. Rice, 321 P.2d 1037 (Ariz. 1958) ..........................................................................24

Lawson v. Life of the S. Ins. Co., 648 F.3d 1166 (11th Cir. 2011)........................................... 22,23

Morristown Daily Record v. Graphic Communications Union Local 8N, 832 F.2d 31
  (3d Cir. 1987). ......................................................................................................................8

MS DealerServ. Corp. v. Franklin, 177 F.3d 942 (11th Cir. 1999) ........................................... 22,29

Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042 (9th Cir. 2009)...............................................23

Mutual Benefit Life Insurance Co. v. Zimmerman, 783 F. Supp. 853 (D.N.J. 1992).........................8,9

PaineWebber, Inc. v. Hartmann, 921 F.2d 507 (3d Cir. 1990)....................................................8,9

PaineWebber, Inc. v. Hofmann, 984 F.2d 1372 (3d Cir. 1993) ....................................................9

Perry v. Thomas, 482 U.S. 483 (1987) ...............................................................................22

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008)......................................................2

PNY Technologies, Inc. v. Samsung Electronics Co., Ltd., Civ-10-4587-SRC, 2011 WL 900154
  (D.N.J. Mar. 14, 2011).................................................................................................... 15,16

Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967) ..................................... 18,26

RCM Technologies, Inc. v. Brignik Tech., Inc., 137 F. Supp. 2d 550 (D.N.J. 2001) ..................... 10,11

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974) ..................................................................8

_Schoneberger v. Oelze_, 96 P.3d 1078 (Ariz. Ct. App. 2004) ........................................................ 23,24,25

_Steelworkers v. Warrior & Gulf Navigation Co._, 363 U.S. 574 (1960) ........................................8

_Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp._, 130 S. Ct. 1758, 1774, 176 L. Ed. 2d 605 (2010).. 20,21

_Teamsters-Employer Local No. 945 Pension Fund v. Acme Sanitation Corp._, 963 F. Supp. 340
   (D.N.J. 1997) ...........................................................................................................................10

_Volt Info. Sciences, Inc. v. Board of Trustees_, 489 U.S. 468 (1989) ............................................8

_Westmoreland v. Sadoux_, 299 F.3d 462 (5th Cir. 2002) .............................................................26

## RULES & STATUTES

9 U.S.C. § 1 ..................................................................................................................................8

9 U.S.C. § 2 ............................................................................................................................10,11

9 U.S.C. § 4 ..................................................................................................................................8

_N.J.S.A._ 2A:16-50 ........................................................................................................................5

_N.J.S.A._ § 17:48-6j ......................................................................................................................5

_N.J.S.A._ § 17:48A-7i ....................................................................................................................5

_N.J.S.A._ § 17:48E-35.7 ................................................................................................................5

_N.J.S.A._ § 17B:26-2.1i ................................................................................................................5

_N.J.S.A._ § 17B:27-46.1i ..............................................................................................................5

_N.J.S.A._ § 26:2J-4.7 ....................................................................................................................5

_L.A.R.S._ § 40:2201 ....................................................................................................................18

_L.A.R.S._ § 23:1033 ....................................................................................................................18

_L.A.R.S._ § 23:1034.2 ..................................................................................................................18

_L.A.R.S._ § 23:1203 ....................................................................................................................18

## OTHER SOURCES

H.R.Rep.No.96, 68th Cong., 1st Sess., 1, 2 (1924) ....................................................................8

## PRELIMINARY STATEMENT

This motion is about a simple distinction between retail pharmacy services and specialty pharmacy services. Plaintiff, Bleeding Disorders Resource Network, LLC d/b/a BDRN, LLC ("BDRN" or "Plaintiff") is a licensed pharmacy in the State of New Jersey, specializing in the treatment of patients with bleeding disorders. BDRN has been approved by the New Jersey Department of Banking and Insurance as a hemophilia provider. BDRN provides unique medications relating to hemophilia, bleeding disorders and HIV (collectively referred to as "Bleeding Disorder Medications"). BDRN has contracted with Defendant, Caremark, LLC to provide retail pharmacy services to Caremark's members pursuant to a Provider Agreement and Provider Manual (collectively referred to as "Retail Agreement"). For Caremark members whose plans cover Bleeding Disorder Medications as a "retail pharmacy benefit," BDRN can provide Bleeding Disorder Medications to those patients under the Retail Agreement. However, for Caremark members whose plans cover Bleeding Disorder Medications as a "specialty pharmacy benefit," BDRN cannot provide Bleeding Disorder Medications to those patients under the Retail Agreement, and is akin to an out-of-network specialty pharmacy. In order to fill Bleeding Disorder Medications for such patients, BDRN would need to be in Caremark's Specialty Pharmacy Network.

BDRN does not have a contract with any of the Defendants for participation in Specialty Pharmacy Networks. BDRN's only contract with any of the Defendants, the Retail Agreement, expressly does not cover participation in Specialty Pharmacy Networks. All of BDRN's claims in this case arise out of BDRN status as an out-of-network specialty pharmacy and from BDRN's desire to enter into a contract with Caremark to be in the Specialty Pharmacy Networks.

While BDRN is in Caremark's Retail Pharmacy Network, BDRN is **not** in Caremark's Specialty Pharmacy Network. Caremark maintains separate agreements governing the participation in the Specialty Pharmacy Network. Defendants have not disputed the existence of separate

Specialty Pharmacy Networks. Defendants have not provided any indication as to who is in the Specialty Pharmacy Networks. Plain and simple, participation in the Specialty Pharmacy Network has nothing to do with the Provider Agreement or Provider Manual governing BDRN's participation in the Retail Pharmacy Network. Importantly, all of BDRN's claims arise out of BDRN's inability to become a specialty pharmacy within Caremark's Specialty Pharmacy Network. BDRN's claims for trade secret misappropriation arise out of claims submitted for prior authorization as an out-of-network provider, and BDRN's Any Willing Provider Law claims seek admission into networks not covered by the Provider Manual.

Defendants filed the instant motion seeking to stay the instant lawsuit pending resolution of this dispute in arbitration. It is respectfully submitted that Defendants' motion is meritless and should be denied as a matter of law because there is no applicable arbitration agreement between the parties and BDRN has not otherwise agreed to resolve this dispute in arbitration.

<u>**STATEMENT OF FACTS**</u>

Plaintiff, BDRN hereby incorporates by reference each of the detailed factual allegations contained in their Amended Complaint. For purposes of this application, these allegations are accepted as true and the Court must draw all reasonable inferences in Plaintiff's favor. <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008); <u>Evancho v. Fisher</u>, 423 F.3d, 351 (3d Cir. 2005). What follows is a summary of those allegations.

BDRN is an independent pharmacy located in Riverdale, New Jersey. BDRN is approved by the New Jersey Department of Banking and Insurance as a hemophilia provider. Independent specialty pharmacies such as Plaintiff are essential to the healthcare delivery system. Unlike other mail-order pharmacies or large chain pharmacies, BDRN provides unique and essential service to the patients including, but not limited to, consultations with patients, education and training to patients on how to take and administer their medications as prescribed, coordination with

hematologists, oncologists and patient support groups, and total patient care and disease management. These services are especially vital for bleeding disorder patients based on the types of diseases and the nature of the medications.

Defendant Caremark, LLC is a pharmacy benefits manager, managing hundreds of million prescriptions annually and servicing patients in the State of New Jersey. A Pharmacy Benefits Manager ("PBM") is a third party administrator of prescription drug programs covered by a Plan Sponsor. A PBM is primarily responsible for processing and paying prescription drug claims. Following the transition from fee-for-service to Medicaid Managed Care, BDRN has been excluded from Caremark's Specialty Pharmacy Networks as they relate to Amerigroup's Medicaid enrollees.

The inability to participate in CVS Caremark's Specialty Pharmacy Network(s), however, is not limited to New Jersey Medicaid Managed Care. BDRN provides an array of pharmacy services to patients with hemophilia and other bleeding and blood disorders, such as HIV. Unlike many other pharmacies, BDRN is unique in that it specializes in servicing patients with hemophilia and other bleeding disorders. The types of medication that BDRN chiefly provides consisting of blood clotting factor for patients with hemophilia, blood coagulant products for patients with bleeding disorders, and various HIV medications (collectively referred to as "Bleeding Disorder Medications"). Declaration of Yolanda Vento (hereinafter "Vento Decl.") at ¶ 9. Pursuant to the Caremark Provider Agreement and Provider Manual (hereinafter collectively the "Retail Agreement"), BDRN is permitted to provide Bleeding Disorder Medications to patients who have insurance that covers Bleeding Disorder Medications as a retail pharmacy benefit, as determined by each patient's Plan Sponsor[1]. Vento Decl. at ¶¶ 10-11. Certain Plan Sponsors classify Bleeding Disorder Medications as a retail pharmacy benefit, while other Plan Sponsors classify the same drugs

---

[1] A Plan Sponsor is an employer, self-funded plan, or health insurer that provides health and pharmacy benefits to its members. The Plan Sponsor utilizes the services of a PBM to administer the pharmacy benefit on behalf of its members. Vento Decl. at ¶ 12.

as a specialty pharmacy benefit. Vento Decl. at ¶ 13. The Retail Agreement covers only BDRN's participation in Caremark's Retail Pharmacy Networks and does not cover any participation in Defendants' Specialty Pharmacy Networks. Vento Decl. at ¶ 15. A pharmacy cannot participate in CVS Caremark's Specialty Pharmacy Networks through the Retail Agreement. Vento Decl. at ¶ 16.

Under the Retail Agreement, BDRN is permitted to provide Bleeding Disorder Medications to eligible members whose Plan Sponsors have classified Bleeding Disorder Medications as a retail pharmacy benefit. BDRN cannot, however, provide Bleeding Disorder Medications to eligible members whose Plan Sponsors have classified Bleeding Disorder Medications as a specialty pharmacy benefit. Vento Decl. at ¶ 17. In order to provide Bleeding Disorder Medications to eligible members whose Plan Sponsors have classified Bleeding Disorder Medications as a specialty pharmacy benefit, BDRN would need to become admitted to Caremark's Specialty Pharmacy Network, and would need to sign a specialty pharmacy agreement. Vento Decl. at ¶ 18. When a patient's Plan Sponsor covers Bleeding Disorder Medications as a retail pharmacy benefit, BDRN can submit a claim to Caremark for adjudication through the claims system as set forth in the Provider Manual. However, if a patient's Plan Sponsor covers Bleeding Disorder Medications as a specialty pharmacy benefit, BDRN cannot process the claim or submit the claim for adjudication through the system as set forth in the Retail Agreement. If BDRN attempts to submit a claim for a patient who has Bleeding Disorder Medications as a specialty pharmacy benefit, the claim will be rejected in Caremark's online claims adjudication system and a rejection code such as "Has to be filled with a specialty pharmacy" or "Not participating in network" will appear. Vento Decl. at ¶¶ 19-20. Notably, for those patients whose Plan Sponsors classify Bleeding Disorder Medications as a specialty pharmacy benefit, BDRN can be (and often is) in the retail network applicable to service those patients from the retail side. Thus, for example, while BDRN would not be permitted to provide Bleeding Disorder Medications to those patients (as they would be considered a specialty

pharmacy benefit), BDRN could nevertheless fill other, non-specialty medications (such as amoxicillin or cholesterol medication) for that patient under the Retail Agreement. Vento Decl. at ¶ 21. Thus, BDRN could be in a given retail pharmacy network pursuant to the Retail Agreement and still be unable to fill specialty medications for patients within that same retail pharmacy network. Vento Decl. at ¶ 22.

Since New Jersey's Medicaid patients began enrolling in contracted Medicaid HMOs, BDRN has attempted several times to become a participating provider in the CVS Caremark Specialty Pharmacy Network(s) to provide services to Medicaid patients enrolled through Amerigroup. When BDRN initially attempted to, BDRN was informed that the Amerigroup Medicaid enrollees would be going through CVS Caremark's Specialty Pharmacy. At a later point in time, BDRN was told it had to apply to participate in CVS Caremark's "Specialty Pharmacy Network." BDRN promptly applied for admission into CVS Caremark's Specialty Pharmacy Network, but was told it could not be admitted because BDRN was not JCAHO[2] accredited for homecare.

In early 2012, again sought admission to CVS Caremark's specialty networks, and was informed that CVS Caremark maintains a formalistic application process, and stated that many pharmacies request initial information, but do not even submit a formal application because they do not qualify.

CVS Caremark has established a Specialty Pharmacy Network (separate and apart from any of its Retail Pharmacy Networks) that explicitly excludes non-CVS pharmacies, including BDRN, from providing hemophilia and bleeding disorder medications to Medicaid enrollees in the Amerigroup HMO, as well as privately insured patients whose Plan Sponsors have classified BDRN's medications as a specialty medication. BDRN has been unlawfully excluded from

---

[2] "JCAHO" refers to The Joint Commission (formerly "Joint Commission on Accreditation of Healthcare Organizations"), a not-for-profit organization that accredits health care organizations and programs within the United States

participation in CVS Caremark's Specialty Pharmacy Network and has been preventing from servicing New Jersey Medicaid patients enrolled through Amerigroup's HMO.

Pursuant to <u>N.J.S.A.</u> 2A:16-50 <u>et</u> <u>seq.</u>, BDRN seeks a judgment of the Court declaring that Caremark's refusal to admit BDRN into CVS Caremark's Specialty Pharmacy Network violates New Jersey's Any Willing Provider ("AWP") Laws[3]. BDRN also seeks an injunction requiring the admission of Plaintiff into CVS Caremark's Specialty Pharmacy Network(s) as a specialty pharmacy.

As the result of a 2007 merger, BDRN must deal with CVS Caremark Corp. and its subsidiaries not only as a large-scale PBM, but also though CVS Caremark's specialty pharmacies which are direct competitors to BDRN. Defendants collected proprietary patient information they received from physicians and other medical providers (in connection with prior authorizations for out-of-network specialty services to be administered by BDRN), and transferred that same information to its own CVS Caremark Specialty Pharmacy, in an attempt to persuade and/or coerce patients to obtain specialty services from CVS Caremark Specialty Pharmacy, rather than BDRN. BDRN devotes substantial time and effort to building relationships with their patients and the communities that it serves. BDRN owns trade secrets in its patient lists and referrals, including in the form of the identity of its pharmacy patient and the compilation of protected health information for those patients as well as their prescription files. This trade secret integrated patient information was created and compiled by BDRN through significant expenditures of time, effort, and expense. This information was disclosed to the Defendants' PBM operation) in confidence and solely for the purpose of obtaining prior authorization for the prescription claims of BDRN's patients in connection with receiving out-of-network specialty pharmacy services. <u>See</u>, Vento Decl. at ¶¶ 24-26.

Defendants used and disclosed the trade secret information for other purposes without the patients', providers' or Plaintiff's authorization or consent. Such information was disclosed for the

---

[3] <u>See</u>, <u>N.J.S.A.</u> § 26:2J-4.7; <u>N.J.S.A.</u> § 17B:26-2.1i; <u>N.J.S.A.</u> § 17:48-6j; <u>N.J.S.A.</u> § 17:48A-7i; <u>N.J.S.A.</u> § 17:48E-35.7; <u>N.J.S.A.</u> § 17B:27-46.1i.

limited purpose of allowing the patients to obtain prior authorization for coverage for services provided by BDRN as an out-of-network specialty provider. <u>See</u>, Vento Decl. at ¶¶ 24-26. Defendants knew this information was being transmitted to them in confidence, given the circumstances and purpose surrounding its limited disclosure. Defendants' improper use of this information for their own gain was intentional and malicious, and has proximately caused BDRN to sustain substantial damages.

In addition, several New Jersey Medicaid patients sought and wished to obtain treatment from BDRN. Several prescribing physicians and medical providers sought and intended to refer New Jersey Medicaid patients to BDRN. Several patients and providers sought to obtain prior authorization for New Jersey Medicaid patients enrolled through Amerigroup's HMO to receive covered services from BDRN. These patients' plans cover Bleeding Disorder Medications as a "specialty pharmacy benefit," thus BDRN cannot service these patients as it remains excluded from Caremark's Specialty Pharmacy Networks, despite its participation in the Retail Agreement. <u>See</u>, Vento Decl. at ¶¶ 24-26. This constituted a reasonable expectation of economic advantage to BDRN. By way of example and not limitation, Defendants interfered with this prospective economic advantage by wrongfully denying the out-of-network prior authorization and thereafter by improperly using protected health information to target and solicit these patients to obtain service from CVS Caremark Specialty Pharmacy. This interference caused BDRN to lose those patients, who were forced to be serviced by CVS Caremark Specialty Pharmacy.

BDRN filed the instant lawsuit seeking monetary damages for improperly diverting Plaintiff's patients away from BDRN, as well as declaratory and injunctive relief. BDRN asserts four causes of action: (1) declaratory judgment, (2) permanent injunctive relief, (3) trade secret misappropriation, and (4) tortious interference with contractual relations/prospective economic advantage. As to its request for declaratory and injunctive relief, BDRN seeks a declaration that the

CVS Caremark's refusal to admit BDRN into Specialty Pharmacy Network(s) violates New Jersey's Any Willing Provider Laws, and Judgment directing CVS Caremark to admit BDRN into CVS Caremark's Specialty Pharmacy Network(s).

## LEGAL ARGUMENTS

### POINT I

### DEFENDANTS' MOTION MUST BE DENIED AS A MATTER OF LAW BECAUSE BDRN DID NOT ENTER INTO AN AGREEMENT WITH DEFENDANTS TO ARBITRATE THE INSTANT DISPUTE AND THERE IS NO APPLICABLE ARBITRATION AGREEMENT BETWEEN THE PARTIES

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA") was designed "to place arbitration agreements 'upon the same footing as other contracts.'" Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) (quoting H.R.Rep.No.96, 68th Cong., 1st Sess., 1, 2 (1924)); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12 (1967). Although the FAA "was designed to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate,'" Volt Info. Sciences, Inc. v. Board of Trustees, 489 U.S. 468 (1989) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-20 (1985)), "the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed in the manner provided for in [the parties'] agreement.'" Volt, 489 U.S. at 474 (quoting 9 U.S.C. § 4).

"The right to compel arbitration derives from a contractual right...." Mutual Benefit Life Insurance Co. v. Zimmerman, 783 F. Supp. 853, 865 (D.N.J. 1992) (citations omitted). Accordingly, the United States Supreme Court and Third Circuit have consistently held that, as a matter of law, no party can be forced to arbitrate unless that party has entered into an agreement to do so. PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990), *overruled on other grounds by* Howsam v. Dean Witter Reynolds, 537 U.S. 79, 85 (2002); see also, AT&T Technologies v. Communications Workers of America, 475 U.S. 643, 648 (1986); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960); Morristown Daily Record v. Graphic Communications

8

Union Local 8N, 832 F.2d 31, 33 (3d Cir. 1987). Moreover, one who is not a party to a contract lacks standing to compel arbitration. Mutual Benefit Life Insurance Co., 783 F. Supp. at 865; see also, Cost Bros. Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985).

A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement[4]. PaineWebber, Inc., 921 F.2d at 511; AT&T Technologies, 475 U.S. at 649; John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-47 (1964). When a dispute consists of several claims, the court must determine on an issue-by-issue basis whether a party bears a duty to arbitrate. PaineWebber, Inc. v. Hofmann, 984 F.2d 1372, 1376-77 (3d Cir. 1993). If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement a dispute should not be compelled to arbitration. Hartmann, 921 F.2d at 511.

### A. There Is No Dispute That an Arbitration Agreement Exists Between BDRN and Caremark, Albeit In a Contract Governing an Entirely Unrelated Subject Matter

Plaintiff does not dispute the existence of an arbitration agreement between Plaintiff and Defendant, Caremark, LLC, as contained in the Retail Agreement. However, the arbitration clause deals only with BDRN's participation as a retail provider under the Retail Agreement. Thus, for the reasons set forth below, BDRN's disputes do not arise out of, nor are they connected with, the Retail Agreement as they deal solely with BDRN's operations and participation as an out-of-network specialty pharmacy.

### B. Plaintiff's Claims Are Outside the Scope of the Asserted Arbitration Clause in the Retail Pharmacy Agreement Because They Do Not Arise Out of Nor Are They Connected to the Retail Pharmacy Agreement

---

[4] "The question whether the parties have submitted a particular dispute to arbitration ... is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 183 (2002) (citations omitted); see also, Kanoff v. Better Life Renting Corp., CIV A 03-2363 FLW, 2008 WL 442145 (D.N.J. Feb. 14, 2008). Thus, in addition to the reasons set forth in Part I.B below, this Court must resolve issue relating to the scope of the arbitration provision.

9

As an initial matter, this Court must decide issues of arbitrability relating to the scope and applicability of the arbitration agreement contained in the Retail Agreement. See, Granite Rock Co. v. Int'l Broth. of Teamsters, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010) ("Where a party contests either the formation of the arbitration agreement or its enforceability or applicability to the dispute at issue, the court must resolve the disagreement"); see also, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 939, 941–43 (1995) ("The question of whether the parties agreed to arbitrate a dispute is one for the courts to resolve"); AT & T Technologies, Inc., 475 U.S. at 649 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator"); Teamsters-Employer Local No. 945 Pension Fund v. Acme Sanitation Corp., 963 F. Supp. 340, 349 (D.N.J. 1997). Because, as a matter of contract, no party can be forced to arbitrate a dispute unless that party has entered into an agreement to do so, AT & T Technologies, Inc., 475 U.S. at 648, Section 4 of the FAA "requires that, before compelling an unwilling party to arbitrate, the court engage in a limited review to ensure that the parties' dispute is arbitrable—i.e., that a valid agreement to arbitrate exists and that the specific dispute falls within the substantive scope of that agreement." RCM Technologies, Inc. v. Brignik Tech., Inc., 137 F. Supp. 2d 550, 552 (D.N.J. 2001); see also, AT & T Technologies, Inc., 475 U.S. at 649. Thus, contrary to the cases from foreign jurisdictions cited by Defendants, the case law within this Circuit and from the Supreme Court plainly state that the Court is to decide issues of arbitrability, including scope.[5]

Here, Plaintiff's claims are indisputably outside the scope of the arbitration provision contained within the Retail Agreement. Section 2 of the FAA states:

---

[5] Further, unlike many other arbitration agreements which explicitly and unmistakably state that the arbitrator is to decide issues of arbitrability, the arbitration provision in the Retail Agreement is silent and does not give the arbitrator that substantive right. See, Provider Manual at p. 50.

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract …, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract…, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Likewise, the arbitration provision contained in the Provider Manual provides for arbitration of "[a]ny and all disputes in connection with or arising out of the Provider Agreement…" See, Provider Manual at p. 50. "In assessing whether a dispute falls within the scope of an arbitration clause, the court's focus is on the factual allegations in the complaint rather than the legal causes of action asserted." RCM Technologies, Inc., 137 F.Supp.2d at 553 (internal quotations and citations omitted). As stated in Brayman Construction Corp. v. Home Insurance Co., 319 F.3d 622 (3d Cir. 2003), a claim will be covered by an arbitration clause "[i]f the allegations underlying the claims touch matters covered by an arbitration clause." Id., at 626.

Here, the factual allegations in BDRN's First Amended Complaint do not have any relation to Retail Agreement containing the arbitration provision, and do not "touch on" any matters covered by the underlying agreement. Put simply, Plaintiff's claims are not "disputes in connection with or arising out of the Provider Agreement." The chief distinction between Plaintiff's claims and those covered by the Retail Agreement is the difference between "Retail Pharmacy Services" and "Specialty Pharmacy Services." The Provider Manual between Plaintiff and Caremark, LLC explicitly and unambiguously states under the "Standards of Operation" section that the Retail Agreement **is for the provision of Pharmacy services by a Retail Pharmacy only** and that specialty pharmacies are not eligible to enter into the Retail Agreement.  See, Provider Manual at pp. 6, 12[6]. Therefore, the plain language within the Retail Agreement states that it is to apply **only** to BDRN's

---

[6] Plaintiff has not attached the Provider Manual as an exhibit or directly quoted the Manual because of the pending motion to seal filed by Defendants, which Plaintiff opposed.  Plaintiff attempted to obtain Defendants' permission with respect to quoting certain portions of the Provider Manual relating to Standards of Operation and Third Party Rights. Because Defendants did not respond substantively one way or the other, Plaintiff shall refer the Court to the provisions within the Retail Agreement when referencing a certain section.  As to the other sections which are quoted in Plaintiff's brief, those sections have already been quoted by Defendants in their moving brief, thus have already been disclosed.

participation as a "Retail Pharmacy" and contemplates a second agreement to be entered into for any pharmacy participating as a "Specialty Pharmacy." Importantly, the Provider Manual states that a Specialty Pharmacy is not eligible to enter into this Agreement. It is this second agreement that BDRN seeks to forge with Caremark and it is this separate relationship under which BDRN brings its claims.

This retail-specialty distinction is consistent with the facts in this case. Unlike the services that many other pharmacies provide, BDRN specializes in servicing patients with hemophilia and other bleeding disorders, and focuses on the dispensing Bleeding Disorder Medications. See, Vento Decl. at ¶ 9. Pursuant to the Retail Agreement, BDRN is permitted to provide Bleeding Disorder Medications to patients whose have insurance that covers Bleeding Disorder Medications as a retail pharmacy benefit, and whether Bleeding Disorder Medications is covered as a retail pharmacy benefit is determined by each Plan Sponsor. See, Vento Decl. at ¶¶ 10-11. Certain Plan Sponsors classify Bleeding Disorder Medications as a retail pharmacy benefit. Other Plan Sponsors classify Bleeding Disorder Medications as a specialty pharmacy benefit. See, Vento Decl. at ¶ 13. Under the Retail Agreement, BDRN is permitted to provide Bleeding Disorder Medications to eligible members whose Plan Sponsors have classified Bleeding Disorder Medications as a retail pharmacy benefit. BDRN cannot, however, provide Bleeding Disorder Medications to eligible members whose Plan Sponsors have classified Bleeding Disorder Medications as a specialty pharmacy benefit. See, Vento Decl. at ¶ 17.

Caremark maintains Retail Pharmacy Networks and separate Specialty Pharmacy Networks, and the Retail Agreement covers only BDRN's participation in Caremark's Retail Pharmacy Networks. See, Vento Decl. at ¶¶ 14-15. The Retail Agreement **does not** cover any participation in Defendants' Specialty Pharmacy Network, and in fact, participation in Defendants' Specialty Pharmacy Networks is governed by an entirely separate agreement. See, Vento Decl. at ¶¶ 15-16.

Thus, a pharmacy cannot participate in any of Defendants' Specialty Pharmacy Networks through the Retail Agreement. <u>See</u>, Vento Decl. at ¶ 16. Notably, for those patients whose Plan Sponsors classify Bleeding Disorder Medications as a specialty pharmacy benefit, BDRN can be (and often is) in the retail network applicable to service those patients from the retail side. Thus, for example, while BDRN would not be permitted to provide Bleeding Disorder Medications to those patients (as they would be considered a specialty pharmacy benefit), BDRN could nevertheless fill other, non-specialty medications (such as amoxicillin or cholesterol medication) for that patient under the Retail Agreement. Thus, BDRN could be in a given retail pharmacy network pursuant to the Retail Agreement and still be unable to fill specialty medications for patients within that same retail pharmacy network. <u>See</u>, Vento Decl. at ¶¶ 21-22.

There is also a distinction with respect to processing claims that fall within the Retail Agreement, and those that relate to the Specialty Pharmacy Networks. For example, when a patient's Plan Sponsor covers Bleeding Disorder Medications as a retail pharmacy benefit, BDRN can submit a claim to Caremark for adjudication through the claims system as set forth in the Provider Manual. <u>See</u>, Vento Decl. at ¶ 19. This falls within the purview and scope of the Retail Agreement. However, if a patient's Plan Sponsor covers Bleeding Disorder Medications as a specialty pharmacy benefit, BDRN cannot process the claim or submit the claim for adjudication through the system as set forth in the Retail Agreement. If BDRN attempts to submit a claim for a patient who has Bleeding Disorder Medications as a specialty pharmacy benefit, the claim will be rejected in Caremark's online claims adjudication system. <u>See</u>, Vento Decl. at ¶ 20. Thus, BDRN cannot submit claims under Caremark's Specialty Pharmacy Network. <u>See</u>, Vento Decl. at ¶ 23.

This distinction applies to the data at issue underlying BDRN's claims for trade secret misappropriation. All the data that Defendants claim a right to under the Retail Agreement was not submitted pursuant to operations by BDRN as an in-network Retail Pharmacy, but rather, was

submitted by BDRN as an out-of-network specialty pharmacy, seeking prior authorization for claims for patients whose Plan Sponsors did not cover Bleeding Disorder Medications as a retail pharmacy benefit, but rather, treated them as a specialty pharmacy benefit. See, Vento Decl. at ¶¶ 24-26.

Plaintiff's claims can (and must) be maintained without reliance on the asserted Retail Pharmacy Agreement and are therefore beyond the scope of the Arbitration Clause. Plaintiff's claims against Defendants are for violations of New Jersey's Any Willing Provider Law and trade secret misappropriation. Such claims are available to Plaintiff without reference to the provisions set forth in the Retail Pharmacy Agreement. Plaintiff's claims do not derive from Plaintiff's relationship to the Defendants under the Retail Pharmacy Agreement, but rather, derive from Plaintiff's relationship with Defendants through a non-existent contract relating to the provision of Specialty Pharmacy Services to Caremark's members. Indeed, it is by virtue of the fact that Plaintiff **does not have a contract with Caremark for Specialty Pharmacy** that forms the basis of Plaintiff's Any Willing Provider claims (i.e., Plaintiff's AWPL claims constitute a complaint that certain Defendants have *refused* to contract with them).

In an effort to tie Plaintiff's claims to the provider agreements, Defendants point to several inapposite provisions. As to the BDRN's claims for trade secret misappropriation, contrary to what Defendants contend, these claims are not "connected with" nor do they "arise out of" the Caremark Retail Agreement. Defendants argue that because the Provider Manual states that "Caremark has the right to use, reproduce, and adapt any information or data obtained from Provider in any manner deemed appropriate, even if such use is outside the scope of the Provider Agreement, provided such use is in accordance with applicable Law." See, Provider Manual at p. 48. This logic does not apply in this instance as the underlying information was not received by Caremark pursuant to the Retail Agreement. The patient information and trade secrets were not transmitted by BDRN and received by Caremark during the relationship governed by the Retail Agreement. Rather, this information was

transmitted by BDRN to Caremark when BDRN was seeking prior authorization for certain claims as an "out-of-network" specialty provider. See, Vento Decl. at ¶¶ 24-26. Thus, it is not the relationship set forth in the Retail Agreement which gives rise to these claims, but rather, it is BDRN's status as an out-of-network specialty provider submitting requests for prior authorization for out-of-network claims. Defendants acknowledge this distinction in footnote 2 of their Brief, wherein they consider the differences between in-network and out-of-network pharmacies. See, Defs. Br. at 1-2 n.2. That the Retail Agreement sets forth the manner in which data is to be collected and used has no bearing on these claims because the information at issue was not submitted by BDRN pursuant to operations within the Retail Agreement, but was transmitted pursuant to a prior authorization request for out-of-network benefits, just as if the pharmacy had no agreement with Caremark, whatsoever.

Moreover, the cases cited by Defendants are not apposite and unavailing under these facts. In PNY Technologies, Inc. v. Samsung Electronics Co., Ltd., Civ-10-4587-SRC, 2011 WL 900154 (D.N.J. Mar. 14, 2011), this Court addressed a motion to compel arbitration involving different facts. In PNY Techs., the plaintiff, through "artful pleading" was attempting to avoid arbitration by focusing only on a Non-Disclosure Agreement (NDA) (which did not contain an arbitration provision), when the parties had also entered into a Memorandum of Understanding ("MOU"), a 2009 Business Agreement ("2009 Agreement"), and a 2010 Volume Agreement ("2010 Agreement"), each of which contained a mandatory arbitration provision. Id., at *2. In PNY Techs., each of the four agreements all covered and dealt with the same subject matter, . Further, unlike in PNY Techs., the information underlying BDRN's trade secret claims did not come within the scope of the confidentiality and propriety of data provisions contained in the Retail Agreement because the information and data was not transmitted to Caremark in connection with operations under the Retail Agreement, but rather was transmitted by BDRN as an out-of-network specialty pharmacy

submitting a request for prior authorization. <u>See</u>, Vento Decl. at ¶¶ 24-26. In addition, the language in the agreements at issue in <u>PNY Techs.</u> was substantially broader than the language at issue here. In <u>PNY Techs.</u>, the agreement defined "Confidential Information" as "*any* non-public information, data, and other materials regarding the products, services or business of a party." <u>Id.</u>, at *4 (emphasis in original). The Provider Manual provides that "the information contained **in the claims system** that was **obtained by and through the administration and adjudication of a claim** by Provider is the property of Caremark…" <u>See</u>, Provider Manual at p. 48 (emphasis added). Here, the information at issue was not transmitted through the claims system and was transmitted for purposes of prior authorization for an out-of-network claim. <u>See</u>, Vento Decl. at ¶¶ 19-20, 23-26. Thus, unlike <u>PNY Techs.</u>, the facts underlying BDRN's claims cannot be said to fall within the scope of the Retail Agreement, but rather, arise out of a completely distinct and separate relationship between Plaintiff and Defendants, expressly excluded by the terms of the Retail Agreement. <u>See</u>, Provider Manual at p. 6.

Similarly, <u>FCI USA v. Tyco Electronics Corp.</u>, Civ. No. 2:06-CV-128-TJW, 2006 WL 2037557 (E.D. Tex. July 18, 2006) does not provide support to Defendants in this case. In <u>FCI USA</u>, the plaintiff argued that "because the trade secret claims are tort claims, they fall outside the scope of the arbitration agreement." <u>Id.</u>, at *1. That simply is not the case here. BDRN is not arguing that because the trade secret misappropriation claims are tort claims, that they are excluded from the arbitration provision. Rather, the subject matter underlying the trade secret claims does not fall within the four corners of the Retail Agreement under any objective reading. Therefore, FCI USA is inapposite as well. BDRN's claims for trade secret misappropriation are clearly beyond the scope of the arbitration clause in the Retail Agreement as they related only to claims submitted by BDRN as an out-of-network specialty provider for certain New Jersey Medicaid patients.

As to BDRN's claims seeking admission to Caremark's Specialty Pharmacy Network based on violations of New Jersey's Any Willing Provider Law ("AWPL"), these claims clearly are not connected with or arise out of Caremark's Retail Agreement with BDRN. Caremark's contention that the Retail Agreement governs the participation in a variety of networks is wrong, insofar as Defendants seek to extend that logic to the Specialty Pharmacy Network. The Retail Agreement addresses solely BDRN's participation in various Plan Sponsors' retail networks. The "various networks" referred to by Defendants relate only to retail networks varying by Plan Sponsor. For example, if a retail pharmacy provider wanted to provide retail pharmacy services to employees of ExxonMobil (who were for example enrolled through a self-funded plan), BDRN would have to be admitted to that specific network and agree to certain network schedules which applied only to that network. Likewise, employees of Goldman Sachs might be covered in a different self-funded plan, and subject to a separate network. Therefore, a pharmacy could provide retail pharmacy services to one group of eligible persons under a given network and could provide retail pharmacy services to another group of eligible persons under a different network, and *these networks* are subject to the Retail Agreement.

However, the Retail Agreement **does not** govern BDRN's participation in **any** Specialty Pharmacy Network. This distinction is important. As it stands, BDRN cannot provide "specialty pharmacy services" to any networks under the Retail Agreement because they do not cover specialty pharmacy. See, Vento Decl. at ¶¶ 18-23.

The non-binding case from a foreign jurisdiction cited by Defendants does not change this conclusion. In Corvel Corp. v. Sw. Louisiana Hosp. Ass'n, CV-05-1330, 2007 WL 594904 (W.D. La. Feb. 21, 2007), the plaintiff, an administrator of a Preferred Provider Organizaiton ("PPO") which had contracted with the defendant hospital, had brought a declaratory judgment action seeking a ruling that the payment portion of the PPO agreement is valid, enforceable and did not violate LA.

R.S. 40:2201 et seq. (Louisiana's Any Willing Provider Statute) or Louisiana's Workers' Compensation Act. Plaintiff's claims for declaratory judgment were precipitated by claims brought by defendant before the Louisiana Office of Workers' Compensation, alleging that plaintiff's discounts under the PPO agreement resulted in an underpayment for medical services rendered to plaintiff's beneficiaries in contravention of defendant's rights under Louisiana law. Id., at *1. In seeking clarification of an order to compel arbitration, plaintiff argued that the statutory claims were outside the scope of the arbitration provision contained in the PPO agreement. However, unlike the facts here, Plaintiff's AWP statutory claims were directly related to the provision of and reimbursement for services to beneficiaries covered by the PPO agreement. Specifically, in its First Amended Complaint, the plaintiff (Corvel):

> ask[ed] th[e] Court for a declaratory judgment that the payment provision of the [PPO agreement] is valid and enforceable, the discounts taken do not violate La. R.S. 40:2201 et seq. or the Louisiana Workers Compensation Act, in particular La. R.S. 23:1033, 1034.2, or 1203.

See, Corvel Corp.'s First Amended Complaint at ¶ 28, Dkt # 28. Finding that the AWP statutory claims "arose under" the PPO agreement, the court stated "we find that the agreement in question creates a relationship, without which, no statutory claims would exist." Corvel Corp., supra, at *2. Here, unlike in Corvel Corp., BDRN is not seeking determination of rights under the Retail Agreement, nor do the AWP-based claims at issue relate to or touch on prescription claims or beneficiaries which are subject to the Retail Agreement. BDRN's AWP-based claims exist completely separate and apart from the Retail Agreement, and thus, are positively beyond the scope of the arbitration clause contained therein.

Further, contrary to Defendants' contention, the existing customers BDRN is losing by virtue of not being in Caremark's Specialty Pharmacy Network are not customers BDRN serves by virtue of being a member in other Caremark networks governed by BDRN's Provider Agreement. Rather, these are customers who were lost as a result of BDRN being kept out of network for

specialty pharmacy services. Some of these customers were New Jersey Medicaid patients who were lost when they were switched from Medicaid Fee-For-Service to managed care through Caremark. Other customers were privately insured patients whose insurance changed, and they became covered by Caremark, and were then prevented from seeking services from BDRN because BDRN remained out-of-network. See, Vento Decl. at ¶¶ 24-26. Thus, if BDRN were in Caremark's Specialty Pharmacy Network, BDRN would not have lost these patients. BDRN has only lost these patients because BDRN is out-of-network and is being kept out-of-network. Therefore, these claims for violations of the AWPL clearly do not fall within the scope of the arbitration provision contained in the Retail Agreement.

Lastly, as to BDRN's claims for intentional interference with prospective economic advantage, these claims too clearly fall well-beyond the scope of the Retail Agreement as well as the arbitration clause contained therein. The very prospective economic advantage Plaintiff asserts that Defendants have interfered with is Plaintiff's ability to service the patients that are currently out of Plaintiff's reach because Defendants refuse to allow Plaintiff into the Specialty Pharmacy Network. Thus, it is inconceivable how interference with economic opportunity by failing to enter into a contract with BDRN to cover specialty pharmacy services could be connected with or arise out of an existing contract with Caremark relating solely to retail pharmacy services.

"[E]ven broad arbitration clauses do not have an infinite reach..." Frindar Megasoft Int'l, Inc. v. Telcordia Techs., Inc., No. A-06-CA-600 LY, 2006 WL 3063434, at *4 (W.D. Tex. Oct. 26, 2006) (citing Jansen v. Salomon Smith Barney, Inc., 776 A.2d 816, 819 (N.J. Super. Ct. App. Div. 2001)). Plaintiffs need not and do not rely on any contractual provisions, or any contract, to assert their claims. In fact, it is the fact that Defendants **refuse to enter into a Specialty Pharmacy Contract with Plaintiff** which forms the impetus of Plaintiff's claims. Consequently, Plaintiff's

claims are not "disputes in connection with or arising out of the Provider Agreement" and are therefore beyond the scope of the Arbitration Clause within the Retail Agreement.

### C. BDRN's Claims Against Non-Signatories Cannot Be Subject to Arbitration as the Non-Signatory Defendants May Not Invoke Rights Under the Retail Agreement

Even if this Court were to find that Defendant, Caremark LLC may enforce an arbitration agreement against Plaintiff and/or on some of Plaintiff's claims, this Court must still examine the circumstances to determine whether the Plaintiff's claims against the other two non-signatory Defendants should be compelled to arbitration. Here, an examination of the facts warrants only one conclusion: Defendants CVS Caremark Corp. and Caremark Rx, LLC cannot invoke any rights under the Retail Agreement to compel BDRN to arbitrate its claims against the two non-signatory Defendants.

### 1. The Non-Signatory Defendants Are Contractually Barred From Asserting the Equitable Estoppel Doctrine.

Defendants concede that CVS Caremark Corp. and Caremark Rx, LLC are not parties to any of proffered Retail Agreements. Yet these same Defendants are attempting to invoke rights under them. The clear language of each of the Provider Manual bars them from doing so, limiting third parties' rights or causes of action under the Provider Agreement to enforcement of indemnification provisions. See, Provider Manual at p. 49. As such, CVS Caremark Corp. and Caremark Rx, LLC are contractually prohibited from invoking the arbitration clauses. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1774 (2010) ("We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes") (emphasis in original); AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011).

"[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, **or by any parties**, that are not already covered in the agreement." E.E.O.C. v. Waffle House, Inc., 534 U.S.

279, 289 (2002) (emphasis added). In <u>Stolt-Nielsen</u>, the Supreme Court applied these same principles to conclude that the defendant had not agreed to arbitrate with third parties.

Since the agreements proffered by Defendants expressly prohibit non-signatories from invoking their provisions, the non-signatory Defendants may not be allowed to do so.

> **2.   Defendants Cannot Compel Plaintiff to Arbitrate Against Non-Signatories Because Arizona State Law, Rather than Federal Common Law Controls Whether Third Parties May Enforce Arbitration Clauses**

The non-signatory Defendants cannot compel Plaintiff to arbitrate its claims against them because they do not meet the requirements under Arizona state law.[7] It is not the since-questioned standard set forth by the Fifth Circuit in <u>Grigson v. Creative Artists Agency</u>, LLC, 210 F.3d 524 (5th Cir. 200) which applies, but instead, it is Arizona's state law pertaining to the doctrine of equitable estoppel which governs this case. Defendants are incorrect in asserting that Arizona law "would likely follow the standard in *Grigson* and other federal courts." <u>See</u>, Defs. Br. at pp. 20-21 n.8.[8]

---

[7] Before it can even be considered whether any non-signatories can compel Plaintiff to arbitrate claims under the Retail Agreement, it must first be found that the Retail Agreement applies to Plaintiff's claims vis-à-vis Defendant, Caremark, LLC. For the reasons set forth in Parts I.C and B, it is Plaintiff's contention that the Retail Agreement does not apply to Plaintiff's claims in this instance (i.e., no valid agreement to arbitrate exists, and, in any event, Plaintiff's claims are outside the scope of the arbitration provision contained in the Retail Agreement). However, assuming that this Court determines that Plaintiff's claims are within the scope of the arbitration provision contained in the Retail Agreement, then the Retail Agreement would apply Arizona state law.

[8] At first glance, Defendants' continued reliance on a body of Fifth Circuit case law is curious, given that the claims were brought in New Jersey, the underlying facts took place in New Jersey, and, the only contract (which Defendants contend governs) selects Arizona as the governing law. However, the real reason Defendants make such reference to Fifth Circuit case law is the fact that Defendants CVS Caremark Corp., Caremark, LLC and Caremark Rx, LLC, and non-party, CVS Pharmacy, Inc. recently made a similar motion in Federal Court in the Southern District of Texas. <u>See</u>, <u>The Muecke Company, Inc. et al v. CVS Caremark Corporation et al</u>, 6:10-cv-00078. On March 29, 2012, Judge John D. Raney adopted Magistrate Judge Nancy K. Johnson's Memorandum and Recommendation (Dkt. No. 182). In Judge Johnson's Memorandum and Recommendation (Dkt. No. 176), Judge Johnson specifically found that the non-signatory Defendants (i.e., CVS Caremark Corp., Caremark Rx, LLC and CVS Pharmacy, Inc.) could not compel the plaintiff pharmacies to arbitrate their claims against them because they were not signatories to the Retail Agreements and plaintiffs were not equitably estopped from avoiding arbitration.

   It is important to note, however, that as to BDRN's claims against Caremark, LLC, the decision in Judge Johnson's Memorandum and Recommendation is inapplicable. <u>Muecke Company, Inc. et al.</u> involved a suit by **retail pharmacies** seeking admission into various **retail pharmacy networks**, and challenged Caremark's use of proprietary information transmitted through the claims system in connection with the processing and adjudication of **retail pharmacy claims**. Thus, those claims were held to fall within the scope of the arbitration agreement because they were related to the **retail** Provider Agreements. (Complaint, Dkt. 1 at ¶ 13). Here, BDRN's claims do not relate to the Retail

In <u>Arthur Andersen LLP v. Carlisle</u>, 129 S.Ct. 1896 (2009), the Supreme Court held that "'[S]tate law,' therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" <u>Arthur Andersen, LLP v. Carlisle</u>, 129 S.Ct. at 1902 (emphasis in original) (<u>quoting</u> <u>Perry v. Thomas</u>, 482 U.S. 483, 493, n. 9 (1987)). According to the Supreme Court "traditional principles of state law" govern whether nonparties can enforce or be bound by the arbitration contract. <u>Id.</u>

Most recently, the Eleventh Circuit recognized that <u>Carlisle</u> effectively overruled the federal common law that had developed on the issue of equitable estoppel.  As stated by the Eleventh Circuit in <u>Lawson v. Life of the S. Ins. Co.</u>, 648 F.3d 1166 (11th Cir. 2011):

> Many of this Court's decisions involving the question of whether a non-party can enforce an arbitration clause against a party have not made clear that the applicable state law provides the rule of decision for that question…. However, the Supreme Court's 2009 decision in <u>Carlisle</u>, which postdates all of those decisions of this Court [referring to cases including <u>Sunkist</u>, <u>MS Dealer</u> and <u>Humana</u>], clarifies that state law governs that question, and to the extent any of our earlier decisions indicate to the contrary, those indications are overruled or at least undermined to the point of abrogation by <u>Carlisle</u>.

<u>Lawson</u>, 648 F.3d at 1170-71. Thus, the Fifth Circuit's entire body of federal common law on the equitable estoppel issue (relied upon by Defendants) originated in the 11th Circuit's now overruled opinion in <u>MS Dealer</u>. <u>See</u>, <u>Grigson v. Creative Artists Agency, LLC</u>, 210 F.3d 524, 527 (5th Cir. 2000) (adopting test from <u>MS DealerServ. Corp. v. Franklin</u>, 177 F.3d 942, 947 (11th Cir. 1999)). As a result, the Defendants' federal common law equitable estoppel theories, to the extent they rely on <u>Grigson</u> and its progeny, are no longer viable.

Instead, as dictated by the Supreme Court in <u>Carlisle</u>, traditional principles of Arizona law which arose to govern contracts generally (as opposed to that applying only to arbitration agreements specifically), control. <u>See</u> <u>also</u>, <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938,

Agreement, but rather, relate solely to BDRN's position as an out-of-network specialty provider, seeking to compel Caremark to enter into a separate Specialty Pharmacy Agreement.

943–44 (1995); <u>Doctor's Assocs., Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996) (while FAA preempts state laws applicable only to arbitration, general state contract law controls validity and enforceability).

Defendants have relegated issues of generally applicable Arizona state law to a footnote, stating that the Arizona Supreme Court would likely apply <u>Grigson</u> because an appellate court had cited to a case which had cited to <u>Grigson</u>. <u>See</u>, Defs. Br. at pp. 20-21 n.8. Reliance on this case to support <u>Grigson's</u> holding on equitable estoppel principles is improper because <u>Schoneberger v. Oelze</u>, 96 P.3d 1078 (Ariz. Ct. App. 2004) predated <u>Carlisle</u> and <u>Lawson</u>, and relies on the now-defunct holding in <u>Grigson</u>.[9] Defendants' reliance on this principle is likely because Defendants could not satisfy the requirements of Arizona's generally applicable equitable estoppel law.

The doctrine of equitable estoppel requires three elements: (1) the party to be estopped [must] commit acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct. <u>Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.</u>, 682 P.2d 388, 399-400 (Ariz. 1984); <u>Flying Diamond Airpark, LLC v. Meienberg</u>, 156 P.3d 1149, 1155 (Ariz. App. 2007); <u>Charles Schwab & Co., Inc. v. Reaves</u>, CV-09-2590, 2010 WL 447370 (D. Ariz. Feb. 4, 2010). In order to invoke the doctrine of estoppel, it must be shown that the defendant while relying on the conduct of the plaintiff was induced to change his position to his detriment or disadvantage; that is, he must have suffered a loss of a substantial character or have been induced to alter his position for the worse in some material respect. <u>Knight v. Rice</u>, 321 P.2d 1037, 1038-39 (Ariz. 1958). Defendants have not and cannot offer

---

[9] Defendants' contention that an Arizona court would likely apply <u>Grigson</u> is further undercut by case law from the Ninth Circuit which held that whether a claims could be arbitrated against a non-signatory turned on who sued first (i.e., if a signatory sued first in court, then he could not be equitably compelled to arbitration). <u>See</u>, <u>Mundi v. Union Sec. Life Ins. Co.</u>, 555 F.3d 1042, 1046 (9th Cir. 2009). In that regard, the Ninth Circuit stated that "in light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated in [certain previous cases]." <u>Id.</u>

evidence in support of any of these elements. Therefore, as non-parties to the contracts at issue, Defendants cannot compel Plaintiffs to arbitration.

Nevertheless, even under <u>Schoneberger v. Oelze</u>, Defendants cannot demonstrate that Plaintiff is equitably estopped or otherwise required to arbitrate its claims against the non-signatory Defendants, CVS Caremark and Caremark Rx. In <u>Schoneberger</u>, the plaintiffs were trust beneficiaries seeking certain benefits and asserting certain rights under a trust which contained an arbitration clause. <u>Id.</u>, at 1080. In that case, the Arizona Court of Appeals found that, in theory, a non-signatory may be entitled to enforce, or be bound by, an arbitration provision in two circumstances: (i) the theory of third-party beneficiaries, and (ii) the theory of equitable estoppel. <u>Id.</u>, at n.6. As to the third-party beneficiary theory, the court noted that a non-signatory "cannot demand benefits under [an agreement] without accepting all of their terms." <u>Id.</u>, at 1081. The court went on in a footnote, stating, "[u]nder the third-party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed." <u>Id.</u>, at n.6 (citations and internal quotations omitted). Therefore, in this case, this theory would not apply because BDRN *is* a signatory to the Retail Agreement, but *is not* seeking to receive any benefits thereunder through this suit. Instead, BDRN is seeking benefits that are not contained nor addressed by the Retail Agreement, namely a separate contract to perform specialty pharmacy services. Further, it cannot be argued that it was parties' intention to have the non-signatory Defendants as third-party beneficiaries, capable of compelling arbitration under the contract given the express language in the Retail Agreement.[10]

Likewise, the court stated that under the equitable estoppel theory, "a non-signatory to an agreement requiring arbitration may be estopped, that is, barred from avoiding arbitration if that party is claiming or has received direct benefits from the contract." <u>Id.</u>, at 1081. Again, the court went on in a footnote, stating, "[u]nder the equitable estoppel theory, a court looks to the parties'

_____

[10] As noted in Part I.C.1 above, the Provider Manual explicitly states that there are no third party beneficiaries under any provision other than the indemnification provisions. <u>See</u>, Provider Manual at p. 49.

conduct after the contract was executed." Id., at n.6 (citations and internal quotations omitted). Thus, once again, this theory does not apply because BDRN is not claiming, nor has it received, direct benefits relating to specialty pharmacy services by virtue of the Retail Agreement. See, Vento Decl. at ¶ 23. Further, the parties' actions since the execution of the Retail Agreement confirm that it was not the intention of the parties to allow non-signatories CVS Caremark and Caremark Rx to arbitrate claims against Plaintiff. Instead, BDRN's actions in response to being continually denied access to the Specialty Pharmacy Network was to file a claim in Federal Court, rather than Arbitration, and thus, BDRN could not be found to be equitably estopped under Schoneberger.

In any event, the Arizona court did not even hold that these theories ultimately applied because it found that the trust did not constitute a valid "written contract" requiring arbitration. Id., at 1079. Therefore, under any reading of Arizona state law, Defendants are not entitled to force Plaintiff to arbitrate its claims against Defendants CVS Caremark Corp. and Caremark Rx, LLC.

### 3. Even If *Grigson* Were Applicable, Equitable Estoppel Does Not Warrant Compelling Arbitration of Against the Non-Signatory Defendants

Even if the terms of the proffered contracts did not prohibit the non-signatories from compelling arbitration, and in the event that this Court decided follow Grigson and its progeny, this Court should still deny the non-signatory Defendants' motion to compel.

Defendants allege that the Plaintiffs' claims against the non-signatory Defendants must be compelled to arbitration under the doctrine of equitable estoppel. This doctrine is not applied lightly, and there is no rigid test for its application. See, Grigson, 210 F.3d at 527.

"The federal policy favoring arbitration does not extend to a determination of who is bound because, as stated by the Supreme Court, the purpose of the Federal Arbitration Act is 'to make arbitration agreements as enforceable as other contracts, but not more so.'" Fleetwood Enterprises, Inc. v. Gaskamp, 280 F.3d 1069, 1074 n.5 (5th Cir. 2002) (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12 (1967)); Westmoreland v. Sadoux, 299 F.3d 462, 465 (5th

Cir. 2002) ("[W]e will read the reach of an arbitration agreement between [contracting] parties broadly, but that is a different matter from the question of who may invoke its protections."). Federal courts have stated that that they "will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances," and it is "wary of choices imposed after the dispute has arisen and the bargain has long since been struck." Westmoreland, 299 F.3d at 465; Hill, 282 F.3d at 349 (even though one prong of the Grigson test was met, district court did not abuse its discretion in refusing to compel arbitration of claims against non-signatory defendant under doctrine of equitable estoppel). In all cases, "'the lynchpin for equitable estoppel is equity,' and the point of applying it to compel arbitration is to prevent a situation that 'would fly in the face of fairness.'" Hill v. G E Power Sys., Inc., 282 F.3d 343, 349 (5th Cir. 2002) (quoting Grigson, 210 F.3d at 528).

The non-signatory Defendants attempt to have it both ways. They rely on an arbitration clause in a contract that, by its very terms, prohibits them from invoking it. See, Hill, 282 F.3d 343 at 346, 348-49 (denying motion to compel arbitration by non-signatory in contract which excluded third parties from enforcing its rights). Here, BDRN neither expected nor agreed to arbitrate disputes with the non-signatory Defendants, or to arbitrate any disputes between their specialty pharmacy and their competitor, CVS Caremark Specialty Pharmacy, run through Caremark Rx, LLC. To the contrary, BDRN expected that their pharmacy's obligations under the Retail Agreement would be confined to the specific party with which they contracted, and to no other parties.

Furthermore, Plaintiff certainly never expected their competitors to obtain rights under their Retail Agreement with Caremark, LLC, or to be compelled to arbitrate claims against their competitors based on such agreements. It would be unjust to require Plaintiff to do so where the Retail Agreement at issue specifically states otherwise, and where the extension of contractual rights to these non-signatory competitor Defendants was unforeseen when the agreement was made. Klay v. All Defendants, 389 F.3d 1191, 1201-02 (11th Cir. 2004) ("[T]he district court properly refused to

compel arbitration of non-par claims asserted by physicians based on arbitration agreements they had signed regarding the provision of services unrelated to the non-par claims.") (citations omitted).

### a. None of BDRN's Against the Non-Signatory Defendants Rely Upon or Derive From the Retail Agreement In Any Way

The first factor noted in <u>Grigson</u> is that the signatory to a written agreement containing an arbitration provision "must rely on the terms of the written agreement in asserting its claims against the nonsignatory." <u>Grigson v. Creative Artists Agency, LLC,</u> 210 F.3d at 527. BDRN undeniably does not need to rely upon the terms of the Retail Agreement to assert its claims against CVS Caremark Corp. and Caremark Rx, LLC. The existence of the Retail Agreement between Plaintiff and Defendant Caremark, LLC is completely unnecessary for Plaintiff's claims against Defendants CVS Caremark Corp. and Caremark Rx, LLC.

As to BDRN's claims for trade secret misappropriation, as set forth in greater detail above, BDRN's claims derive from a relationship wholly independent of the Retail Agreement. The information and data underlying BDRN's trade secrets claims was not voluntarily transmitted from BDRN to Caremark under the Retail Agreement; rather, all data and information was transmitted pursuant to BDRN's status as an out-of-network specialty pharmacy, separate and apart from its dealings as a retail pharmacy. Defendants mistakenly assert that the scope of the Retail Agreement applies to the information received by Caremark, from BDRN as an out-of-network specialty provider seeking prior authorization for claims that could not be submitted through the Retail Agreement. <u>See</u>, Defs. Br. at p. 24. Thus, these claims do not rely upon the Retail Agreement.

As to BDRN's claims for AWP violations against the non-signatory Defendants, these too do not rely upon the Retail Agreement. As is set forth above, only BDRN's participation in Caremark's **retail** networks is governed by the Provider Agreement. Participation in Caremark's Specialty Pharmacy Networks is not covered by the Retail Agreement. <u>See</u>, Provider Manual at p. 6. It is these extraneous, extracontractual Specialty Pharmacy Networks that BDRN is seeking

admission to. BDRN is not relying on the Retail Agreement because the Retail Agreement does not apply to these networks. Therefore, these claims too do not rely upon the Retail Agreement.

Lastly, as to BDRN's claims for tortious interference, this count fully embodies BDRN's claims and highlights the conclusion that no arbitration may be compelled against the non-signatory defendants. This is because tortious interference presupposes no existence of a contractual relationship (otherwise, it would be breach of contract). Instead, it is BDRN's economic opportunity with respect to the patient who BDRN cannot serve by reason of the fact that it remains an out-of-network specialty provider. Thus, BDRN's claims against the non-signatories neither derive from, nor rely upon, the relationship governed by the Retail Agreement. Instead, they arise out of a completely separate, independent, and unrelated relationship. Therefore, the first factor of Grigson is clearly not met.

### b.  This Court Has Discretion to Deny the Non-Signatory Defendants' Motion to Compel Even When One *Grigson* Factor Is Present

In any event, assuming that this Court found that one of the Grigson factors were met, this Court should exercise its discretion to deny the non-signatory Defendants' motion to compel arbitration. As mentioned above, Grigson established a two-factor test: equitable estoppel may apply in circumstances where (1) the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory; and (2) the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. See, Grigson, 210 F.3d at 527 (adopting test from MS Dealer, 177 F.3d at 947). "Each case turns on its facts." Id.

Equitable estoppel is "much more readily applicable when the case presents ***both*** independent bases." Grigson, 210 F.3d at 527; Hill, 282 F.3d at 349 (denying motion to compel arbitration even where second prong of Grigson test was met). Further, "detrimental reliance is one

of the elements for the usual application of equitable estoppel." See, e.g., Grigson, 210 F.3d at 528. Unlike Grigson, here, Defendants have made no demonstration nor offered evidence of detrimental reliance to entitle any of them to the doctrine of equitable estoppel. Therefore, in the event that this Court finds one of the Grigson factors to be present, this Court should nonetheless exercise its discretion and deny Defendants' motion to compel arbitration against the non-signatories.

### POINT II

### EVEN IF THIS COURT COMPELS ARBITRATION AGAINST DEFENDANTS ON ANY WILLING PROVIDER CLAIMS, PLAINTIFF MUST STILL BE PERMITTED TO LITIGATE CLAIMS AGAINST DEFENDANTS FOR TRADE SECRETS MISAPPROPRIATION AND INTERFERENCE WITH ECONOMIC RELATIONS

Even if this Court were to find that BDRN's claims for admission to Specialty Pharmacy Networks were covered by the Retail Agreement and therefore subject to arbitration, BDRN must still be permitted to litigate its claims for "patient slamming" in Federal Court as those claims clearly are distinct and independent of any contract with Defendants, and fall outside the scope of the arbitration provision.

"Patient slamming" is the practice of obtaining confidential and proprietary patient information from the pharmacy during the prior authorization process, and using that information to contact the patient and the prescriber directly, in an attempt to market to the patient and otherwise coerce the patient (and/or the prescriber) to have the prescription filled at Defendants' CVS Caremark Specialty Pharmacy, administered by Caremark Rx, LLC. Here, BDRN brings claims for patient slamming against Defendants by virtue of them having taken information submitted by BDRN in the course of obtaining a prior authorization for out-of-network reimbursement, and transmitting it from Defendants' PBM arm (Caremark, LLC) to Defendants' specialty pharmacy arm (Caremark Rx, LLC).

Defendants' actions in this regard clearly and unmistakably fall outside the context of any agreement between Defendants and Plaintiff, and therefore outside the scope of the arbitration

provision. This is because the patient information and trade secrets transmitted by BDRN in connection with prior authorization attempts were transmitted to and received by Caremark in connection with BDRN's status as an "out-of-network" specialty provider seeking prior authorization to be reimbursed for out-of-network claims. See, Vento Decl. at ¶¶ 24-26. These claims were completely outside the framework of any contractual relationship between the parties. The existence of the Retail Agreement has absolutely no bearing on these claims. It cannot be said that these claims touch on, arise out of or are connected with the Retail Agreement governing claims by in network pharmacies as they were submitted by BDRN as an out-of-network provider. The Retail Agreement does not give a participating provider the right to submit out-of-network claims, nor does it even address the submission of such claims.

As described in Point I.B above, the claims forming the basis for BDRN's trade secret and tortious interference causes of action related only to claims submitted by BDRN as an out-of-network specialty provider for certain New Jersey Medicaid patients. Thus, BDRN's claims for trade secret misappropriation and intentional interference with prospective economic relations are sufficiently narrowly limited and do not fall within the purview of any contract between the parties. Hence, as these are entirely extra-contractual claims, these claims must not be compelled to arbitration, even if this Court finds the AWPL claims to fall within the scope of the arbitration clause.

## CONCLUSION

For each of the aforementioned reasons, it is respectfully submitted that Defendants' Motion to Stay in Favor of Arbitration, or to Dismiss, must be denied.

**FRIER & LEVITT, LLC**

By:    s/ Todd Mizeski
        Jonathan E. Levitt, Esq. (JL 3881)
        Todd Mizeski, Esq. (TM 3854)
        84 Bloomfield Avenue
        Pine Brook, NJ 07058

Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com

Attorneys for Plaintiff, Bleeding Disorders
Resource Network, LLC

Dated: September 4, 2012

## <u>CERTIFICATION OF SERVICE</u>

I, Todd Mizeski, Esq., of full age, do hereby certify:

1.      On the date set forth below, the following individual(s) were automatically served with an Electronic Copy of the attached document via the District of New Jersey's Electronic Case Filing System:

> Anne B. Sekel, Esq.
> FOLEY & LARDNER, LLP
> 90 Park Avenue
> New York, NY 10016
> (212) 682-7474
> Email: asekel@foley.com
> Attorneys for Defendants, CVS Caremark Corporation,
> Caremark RX, LLC, and Caremark, LLC

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

> By:____s/ Todd Mizeski_____
> Jonathan E. Levitt, Esq. (JL 3881)
> Todd Mizeski, Esq. (TM 3854)
> 84 Bloomfield Avenue
> Pine Brook, NJ 07058
> Telephone: (973) 618-1660
> Facsimile: (973) 618-0650
> jlevitt@frierlevitt.com
> tmizeski@frierlevitt.com
>
> Attorneys for Plaintiff,
> Bleeding Disorders Resource Network, LLC

Dated: September 4, 2012